[No. 41959. En Banc. October 21, 1971.]

ELSIE CUNNINGHAM *et al., Appellants,* v. COMMUNITY COLLEGE DISTRICT No. 3, *Respondent.*

*Herbert H. Fuller,* for appellants.

*Slade Gorton, Attorney General,* and *Douglas Cook, Assistant,* for respondent.

*Parr, Alexander, Cordes & Sutherland,* and *Clifford F. Cordes, Jr.,* amicus curiae.

SHARP, J.—This is an appeal from a superior court judgment reversing a decision of the Higher Education Personnel Board (hereinafter called the "personnel board") which had ordered reinstatement of some eight food service employees of Olympic College. The controversy developed as follows.

For several years prior to May 1970, Olympic College operated a food service facility for students, faculty, and employees which was open for business approximately 6 hours per day during each academic year, from mid-September through mid-June. Breakfasts, lunches and snacks were served, but not dinner meals. Hours of employment of its employees, the appellants, varied from 4 to 6 hours per day, and their average length of employment at the time of their termination was approximately 2 years each. Due to difficulty of some of its approximately 2,500 enrolled students in securing housing, the college board of trustees commenced planning in July 1969 for a dormitory residence hall to house up to 212 students. In conjunction with this planning, the college felt that it would not be economically feasible to provide the additional required food service with its existing employees. Rather, it was the college board of trustees' determination that all of the food services could better be provided by an independent contractor operating with its own employees. In reaching this conclusion, the trustees examined the profit and loss obtained from the then present school-operated facility, noting that in 1967-68 the food service, including vending machines, operated at a net loss of $1,601.44, in 1968-69 it made a profit of $1,384.91, and in 1969-70 a profit of $5,659.42. Believing themselves incapable of adequately operating food service at the required increased level of service, they entered into a contract with Slater, Inc., a Dela-

ware corporation, to operate the service. Under the contract, Olympic College would continue to provide all of the food service facilities, all equipment, janitorial service and all utilities necessary for the operation. The menu would be subject to approval of the college, and the contractor was to employ only employees acceptable to the college.

In preparation for changeover, the college board requested the college president to give notice to the appellants. The notices, delivered to the appellants in person by the president, stated in relevant part as follows:

> We regret to inform you that Olympic College will not engage in the operation of any food services after June 12, 1970. As a result, the position which you now hold will no longer exist as of that date and therefore, your employment will be terminated then.
>
> . . .
>
> This letter constitutes notice of separation pursuant to Higher Education Personnel Board Rule 251.10.030. We thank you for your loyal service and regret that our relationship will shortly come to an end.

The appellants then commenced this proceeding before the personnel board under the provisions of RCW 28B.16.120 (2) and (3). These statutes provide, in part, that:

> (2) Any employee who is reduced, dismissed, suspended, or demoted, after completing his probationary period of service as provided by the rules and regulations of the board, shall have the right to appeal to the board
>
> . . .
>
> (3) Any employee who feels that any classification should or should not be exempt . . . may appeal to the board in the same manner as provided in subsection (2) above . . .

After a hearing, the personnel board entered its findings of fact and conclusions of law providing, in essence, that the appellants were nonexempt civil service employees entitled to the protection of the State Higher Education Personnel Law, RCW 28B.16.010 *et seq.* Concluding, further, that the college's action in terminating their employment was, in

actuality, an unauthorized exempting of these employees from civil service status, the personnel board ordered their reinstatement. The board's conclusion of law 9 effectively summarizes its determination:

Therefore, Olympic College, an Institution of Higher Education, does not have the authority to exempt food service personnel from civil service coverage by any action or device, including that of hiring an apparent independent contractor for the performance of such services.

The college appealed the personnel board's order and the trial court, reviewing the record before the personnel board, concluded that the personnel board's decision was based upon an error of law, to wit, that the college was not authorized by law to contract for food services. The significant conclusions of law of the court were as follows:

Conclusion of law 5:

A necessary part of the Higher Education Personnel Board's decision in this case is the conclusion that the college was not authorized by law to contract for food services, said conclusion being founded upon and containing an error of law.

Conclusion of law 6:

Such a conclusion is not within the proper reviewing authority of the Higher Education Personnel Board and should therefore be reversed as containing and being founded upon error of law.

The trial court, upon concluding as a matter of law, that the college had authority to contract for its food services, apparently deemed it unnecessary to review the board's findings of fact, including the finding that appellants were nonexempt, civil service employees. Hence, the trial court did not consider their tenure rights, if any, under the State Higher Education Personnel Law.

The status of the record before us, then, is a finding of the personnel board that the appellants are nonexempt employees, which finding was disregarded but not disturbed by the trial court. However, we determine their employment status of considerable importance to a proper determination of the case.

■ In reviewing the record, we are mindful that RCW 28B.16.150(b) setting forth the bases for judicial review of a personnel board order is identical in all material respects to RCW 41.06.200, the statute setting forth grounds for court review under the state civil service law. This latter statute was before this court in *Gogerty v. Department of Institutions,* 71 Wn.2d 1, 426 P.2d 476 (1967), wherein, after analyzing the superior court's review function in detail, we concluded at page 8, that:

Rather, it is our opinion that the legislature intended, by the aggregate import of the provisions of the civil service act when viewed within the context of the normal division of executive and judicial functions in the public employment area, that the personnel board's findings of fact on disputed issues would carry into the superior court a prima facie presumption of correctness, and that such presumption could only be overcome by a demonstration that the competent evidence adduced before the board actually, factually and substantially preponderated *against* the board's findings.

Likewise, in examining this court's function, we are mindful that we have before us the identical record considered by the trial court and which, insofar as the findings of fact are concerned, was not disturbed by the trial court. We, also, have no basis for disturbing these findings. In particular, although the respondent argued before the board and alternatively argued before the trial court that appellants were exempt from civil service coverage as part-time employees, such alternative argument was not urged before this court. As respondent states in its brief:

The Higher Education Personnel Board found that these employees were not exempt. *The trial court made no finding or conclusion on this point and the exempt or nonexempt status of the appellants is not in controversy before this court.* In fact, there has been no actual attempt to exempt the college's employees in this case. To the contrary, these employees were given notice of layoff pursuant to the Higher Education Personnel Board rules. The college is not attempting to exempt any of *its employees* engaged in food service nor is it asking that the Higher Education Personnel Board do so.

Respondent emphasized this point in oral argument before this court, as follows:

> The respondent makes absolutely no argument that these people are not state employees and not entitled to jurisdiction under the Higher Education Personnel Board.

Due to respondent's theory of the case at this point, as well as our analysis of the judicial function in civil service review matters, we do not view the board's finding that appellants were protected by civil service coverage at time of layoff as in dispute, and will accept such finding for purposes of appeal. Insofar as such finding also constitutes a conclusion of law, we are satisfied that such conclusion is consistent with the special legislative concern for food service employees reflected in RCW 28B.16.040 (5), as follows:

> The governing board of each institution, and related boards, may also exempt from this chapter, subject to the employees right of appeal to the higher education personnel board, classifications involving research activities, counseling of students, extension or continuing education activities, graphic arts or publications activities requiring prescribed academic preparation or special training, and principal assistants to executive heads of major administrative or academic divisions, as determined by the higher education personnel board: *Provided,* That no nonacademic employee engaged in office, clerical, maintenance, or *food and trade services* may be exempted by the higher education personnel board under this provision.

(Italics ours.)

As these employees come within the coverage of the State Higher Education Personnel Law, it is appropriate to determine the intent of the legislature in its passage of the act. It is apparent that the legislature realized there was no uniform statewide policy applicable to the nonprofessional employees of the various state community colleges, and sought to impose a civil service system with the least disruptive impact possible. Its purpose is stated in RCW 28B.16.010, in pertinent part, as follows:

> The general purpose of this chapter is to establish a system of personnel administration for the institutions of

higher education in the state which is based on merit principles and scientific methods, and which governs the appointment, promotion, transfer, layoff, recruitment, retention, classification and pay plans, removal, discipline, and welfare of employees covered under this chapter.

To implement this purpose the act imposes civil service status on all employees except those exempted, either by specific classification language, or by an affirmative procedure set forth in the act. The act further imposes the duty on the personnel board to promulgate rules and regulations covering, among other matters, the "Dismissal, suspension, or demotion of an employee", RCW 28B.16.100(2)(b), and "Layoffs when necessary and subsequent reemployment", RCW 28B.16.100(2)(g). This the board has done, adopting (insofar as relevant here) WAC 251-10-030, as follows:

LAYOFF. (1) An appointing authority may separate an employee without prejudice because of lack of funds or curtailment of work.

It is this rule which was referred to in the notices of termination. While the finality of the separations herein involved raises a question as to whether or not the action constituted a "layoff" within the decisional and statutory definition of that term (*see State ex rel. Ausburn v. Seattle*, 190 Wash. 222, 67 P.2d 913, 111 A.L.R. 418n. (1937)), the parties before this court as well as the board itself termed the action of the college as a "layoff" and we will accept it as such accordingly.

The first question posed is whether or not either of the grounds for layoff of (1) curtailment of work or (2) lack of funds was met by the college. The board found and concluded in the negative, and we agree.

Regarding lack of funds, the record indicates that there was no definitive investigation or study of its food service capability by the college. No expense or cash flow projections were presented, and no independent expert analyses or opinions offered. And even though food service facilities must be self-sustaining, RCW 28B.50.140(5), no estimates of meal costs to the customers were presented. The testi-

mony of the college administrators who were instrumental in instigating the layoff indicates that their action was based upon belief, feeling and impression that there would be an economic advantage to a contracted service. The president of the college testified, as follows:

Q. I see. So you decided not to put a cafeteria in the dormitory; then what did you start thinking about? A. Well, then, too, again at this point it was more of an impression, we doubted that our cafeteria staff could provide the kind of service, well, three meals a day, year round, or at least during nine months, and hopefully in the summertime, too, that would be required in this dorm, mainly because they had never experienced this sort of operation, to our knowledge.

In like manner, the chairman of the college's board of trustees testified, as follows:

Q. . . . do you have any idea about how much money it would cost to run the food service? A. No. Q. You don't have right now? What I am asking about is whether you just have a general feeling that the money isn't there or whether you have investigated this in some detail and you had an idea how much funds were available, how much in funds it would cost the College if they were to expand on their present food service staff and carry out the future of this operation with the dormitory? A. I do not know an exact figure or the amount of equipment it would necessitate. No, I do not. Q. That would depend upon the price, of course, to the student, wouldn't it? A. No, it would not. It would depend upon the amount of monies available to buy equipment necessary to sustain or develop that type of program. I am talking about the purchase of equipment and the amount of money that would be necessary— Q. Well, the College is paying for the equipment anyway, isn't it? Not the contractor? A. I am not aware of it. I don't have the answer to that question.

Similarly, the college's business manager testified before the board, as follows:

Q. Describing now in a general way, what is—what have been your thoughts in your tenure here about the operation of the food service on the Campus? A. I think first, basically, the facilities were not comparative with the

number we feed on Campus, or should. I would say in all deference to the ladies, they have worked under some handicap. . . . Q. . . . . What were the similarities or the differences at that time than what is contemplated for the dormitory students? A. I think the main thing would be volume. Providing three meals at that time and three at this. I think it would be a more efficient operation to provide for two hundred rather than thirty. But I think that in talking in this sense we did talk this over in many areas and it looked very difficult to feed students three meals a day for a dollar and seventy-five cents.

To hold that the college in this case established a lack of funds, or a future lack of funds, to continue the employment of appellants in its food service facilities would be to engage in speculation and to seriously impair the legislative scheme enacted for the protection of civil service employees.

Respondent relies upon *Haga v. Seattle,* 3 Wn.2d 31, 99 P.2d 623 (1940), for the proposition that a public agency may contract for work, in the process laying off civil service employees performing the work. However, as correctly analyzed in H. Kaplan, The Law of Civil Service 96 (1958), this court concluded that the work could not be accomplished otherwise due to a "lack of funds":

A contract by the City of Seattle with a federal agency (Works Progress Administration) for the latter to perform work for the city with the use of employees of the federal agency was held to be a plausible exception from the civil service law requirements. The court reasoned that the City advisedly adopted the contract method of having the work done by the federal agency for "had it not been for the assistance of the Works Progress Administration, the work could not have been done because of lack of funds," and presumably the positions would have been abolished for reasons of economy.

The evidence also effectively negates a showing of curtailment of work in the instant case, since it is conceded that the college's food service was being expanded rather than eliminated or reduced. This alternative condition precedent to layoff, of curtailment of work, cannot be estab-

lished by merely showing that the employer has determined, for whatever reason, to have the work accomplished by others. Such interpretation of the board's rule would render any limitation upon an employer's right to remove an employee (whether by discharge, layoff, or by any other means) meaningless, completely thwarting the purposes for a civil service system. In short, the discharge of appellants was not based on merit principles and scientific methods of personnel administration as prescribed by the legislature and carried into effect by the board rules.

Respondent calls our attention to *State ex rel. Voris v. Seattle*, 74 Wash. 199, 133 P. 11, 4 A.L.R. 198 (1913). We there held that in the interest of economy and efficiency the Seattle City Council could combine the work of several civil service employees so that their duties would thereafter be performed by a lesser number of civil service employees. While the case was not based on any interpretation of the statutes and rules pertaining to layoff which are applicable in the instant case, the facts showed a typical curtailment of work situation.

Respondent finally places reliance upon *State ex rel. Burris v. Seattle*, 82 Wash. 464, 144 P. 695 (1914), which also is a reorganization of city services, resulting in a curtailment of work. The factual basis for our decision affirming an employee dismissal was stated, at page 465:

> The superintendent of the department testified that the appellant was removed from the position of weighman because the weighing of garbage was unnecessary, and no sufficient appropriation had been made to meet the salary of the weighers; that he had not been continued as a deckman, because it was found that the services could be performed with a less number of men than were then being employed, and that economy required the lessening of the forces employed in the service of garbage removal.

■ Respondent argues, however, that the college has a basic, "management control" right to contract for its services, and that nothing in the State Higher Education Personnel Law can, or is intended to restrict this right. Stating respondent's proposition another way, it argues that the

personnel law applies only where there is a continuing employer-employee relationship; but where the institution decides to have the work accomplished by an independent contractor, the relationship may be terminated by the employer, rendering the personnel law inapplicable.

Respondent calls our attention to the Community College Act of 1967, as amended in 1969, setting forth the powers and duties of community college boards of trustees, as evidencing such a legislative intent. In particular, respondent points to RCW 28B.50.140, which provides, in part:

Each community college board of trustees:

. . .

(5) May establish or lease, operate, equip and maintain dormitories, food service facilities, bookstores and other self-supporting facilities connected with the operation of the community college;

We are not persuaded that this language manifests a legislative intent to confer the blanket power exercised by the college in this case, to wit, the power to lay off civil service employees performing work in these specified self-supporting facilities of community colleges, without regard to the requirements of the State Higher Education Personnel Law.

Certainly the legislature had the Community College Act of 1967 in mind when, in 1969, it not only adopted extensive amendments to that act, but adopted the State Higher Education Personnel Law and made it specifically applicable to the various state community colleges. We may further presume that the legislature, in specifically providing that food service employees may not be exempted from the provisions of the personnel law, was aware that at least some of the community colleges had food service employees on their staffs at that time. If the legislature intended the Community College Act to authorize, what is in effect an exemption of food service employees from the protection of the act, it would have manifested its intention either by further amendment to the Community College Act or by insertion of an additional exemption in the State Higher

Education Personnel Law. Reading the two acts together, the most that can be said is that, under proper circumstances (*i.e.,* curtailment of work or lack of funds), food and trade service employees may be laid off within the terms of, and under the procedure established by, the personnel law. The record before us does not reflect these circumstances.

In reaching this result, we are in agreement with the assertion of respondent that civil service employees have no inherent right to work. Indeed, such concession was readily made by appellants in oral argument before this court, as follows:

> We concede that civil service jobs can be abolished. We concede that right out. If the college, and I was going to come to this in a little bit, if the college decided that it wanted to discontinue the food service, the employees have no God-given right to a job. . . . The students who are in the dormitory have no God-given right to be able to have dinner as well as lunch or anything else. The appointing authority has the right to abolish jobs (and this has got to be the way civil service is run) due to lack of funds or curtailment of work.

And, also:

> Now there is much case authority to the effect that an appointing authority does have the right to reorganize, and that the employee has no vested right to his job; and with these we agree. There are even some cases of where one governmental unit has discontinued a particular function, only to contract with another governmental unit to henceforth perform that function. Again, with this we have no quarrel.

We recognize that the trustees of institutions of higher education are charged with the primary duty of providing the best possible education at a reasonable cost. But, in the area of personnel, the State Higher Education Personnel Law is the statutory scheme within which their responsibility must be fulfilled. No purpose would be furthered by a philosophical discussion of the merit or lack of merit of our system of employment security for state employees in our institutions of higher learning, sometimes at additional ex-

pense to the public and the students. Such is exclusively a legislative function.

We therefore hold that the trial court erred in disregarding the State Higher Education Personnel Law, RCW 28B.16, so as to conclude that the instant contract could be used to effectuate a termination of the appellants' employment, even though the requisites for layoff or other termination were absent.

The trial court's stay of the reinstatement order of the Higher Education Personnel Board is vacated with orders to reinstate appellants in conformity with the views expressed herein.

HAMILTON, C.J., FINLEY, ROSELLINI, HUNTER, STAFFORD, and WRIGHT, JJ., concur.

HALE and NEILL, JJ., concur in the result.